## Prestonsburg Water Co. v. Dingus.

(Decided Dec. 17, 1937.)

S. S. WILLIS and ALLEN & TACKETT for appellant.

J. B. CLARKE for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Reversing.

William Dingus has recovered judgment against the Prestonsburg Water Company, a corporation, for $2,500 as damages for the destruction of a storehouse and other buildings by fire alleged to have resulted from a failure of the water company to comply with the provisions of the franchise under which it was operating its water plant in the city of Prestonsburg.

In his petition appellee set out section 7 of the ordinance under which appellant operated, providing in effect that appellant's assignor, G. C. Davis, to whom the franchise was granted, would install and place at such points and streets, alleys, etc., as might be determined by the city council all necessary hydrants and fire plugs to be used in case of fire for which the city would pay the sum of $20 each per year and that Davis or his assigns would furnish an unrestricted use of water in case of fire or to prevent the spread of same at the pressure required in the franchise. The petition also set forth at length section 10 of the franchise which so far as is pertinent provides "that the water used for fire plugs in case of fire shall have at least sufficient pressure to force a stream of water through ordinary two inch fire hose, forty-five feet vertically." It is alleged in the petition in substance that when the fire alarm was given and before the spread of the fire from an adjoining building to the buildings of appellee, the chief of the city fire department responded with ample equipment, properly manned, to have prevented the spread of the fire from the adjoining building to plaintiff's buildings and would have done so but for the fact that appellant negligently, wrongfully, and unlawfully breached the covenants of its franchise in that it failed to furnish a supply of water sufficient to throw a stream of water through a 2-inch hose to a height of 45 feet vertically and failed to furnish unrestricted or adequate supply of water for fire protection.

The answer controverted the allegations of the petition and affirmatively pleaded as a defense that the city had violated the terms of the ordinance in that it had

not paid any rental for fire plugs for two or three years and the company was thereby relieved of any liability for the alleged breach of the ordinance.

One of the grounds relied on for reversal is that the instructions are erroneous and prejudicial to appellant in that they authorized a finding for appellee if appellant "failed to furnish an unrestricted use of water for fire plugs," etc., it being argued that the use of the words "unrestricted use" rendered the instructions fatally defective. That, of course, depends upon the sense in which the words "unrestricted use" were used in the franchise contract. The construction of such contracts is governed by the rules applying to contracts generally, and courts in determining the meaning of any portion of a contract and the intention of the contracting parties should look to the instrument as a whole and consider such portion in connection with all parts. When that is done in this instance, it is quite apparent that the words "unrestricted use" meant that for the consideration recited the city without any additional obligation or charge should have the free use of water for the purposes specified without regard to quantity or to the duration of such use. There is no evidence of any such restriction and therefore no reference should have been made to it in the instructions. Under the evidence, the inclusion of the words complained of in the instructions was calculated to mislead the jury.

It is further argued by counsel for appellant that the verdict is palpably against the evidence. In Mountain Water Company v. Davis, 195 Ky. 193, 241 S. W. 801, it is said:

"Contrary to the holding of the great majority of courts, we have held since the opinion in the case of Paducah Lumber Company v. Paducah Water Supply Co., 89 Ky. 340, 12 S. W. 554, 13 S. W. 249, [11 Ky. Law Rep. 738], 7 L. R. A. 77, 25 Am. St. Rep. 536, that a citizen may sue in such cases to recover damages produced by fire and sustained by him for the failure of the water company to furnish the quantity of water and pressure required by its franchise contract. Notwithstanding that right, however, a recovery cannot be had unless there is evidence in the case to establish the necessary facts therefor."

The Dingus store building faced Stanley street and

was on the opposite side of Harris street from where the fire started in the Harris building, but the evidence is not clear as to the distance between these buildings. The Harris building was practically destroyed when the city fire fighting equipment arrived on the scene and the fire had spread to the Dingus store building, but there is a sharp conflict in evidence concerning the head-way the fire had gained in that building. A number of witnesses testified that the fire had not reached the in-side of the building, while the evidence of others indi-cates that it had. The evidence shows that the city is poorly equipped for fighting fires; that it has a fire chief; and that it is one of the duties of the chief of police to fight fires, but practically all the training these men have acquired is that gained from fighting local fires. There is no trained or organized fire department, but the fire chief and the chief of police must in case of fire depend on volunteers. The evidence shows that the equipment included several hundred feet of good fire hose. Some of the witnesses for appellee stated that this was 2½-inch, while others stated that it was 3-inch hose. The opening in the fire plugs is 2 inches, but it has been so equipped that larger hose may be at-tached to it. There is evidence for appellee that a line of hose was attached to a fire plug in Harris street and on the side of Stanley street opposite the Harris and Dingus buildings; that when the water was turned on the pressure was not sufficient to throw the water on the burning buildings from where the men handling the hose stood, but the evidence of appellee's witnesses in-dicates that the heat was so intense that the firemen could not get near the burning building. It does not clearly appear just how near they could get. The heat must have been very intense because there is evidence that buildings on the opposite side of Stanley street. which is 50 feet in width, caught on fire and the cushion on the seat of the fire engine burned. There is evi-dence that chemical fire extinguishers were included in the fire fighting equipment but were not used, and we assume that this was because the firemen could not get near enough the building. The evidence for appellee is to the effect that the bottom of the reservoir which has a depth of 30 feet and a diameter of about 30 feet is 160 feet above the level of the city; that as soon as notified of the fire, its engines were started and pumped 1,500 gallons into the reservoir and its gauges show that

27,000 gallons of water were used while the fire was in progress; that it has an automatic gauge which records the water pressure for every 24 hours and it placed in evidence the chart made by this gauge on the day the fire occurred which showed that the pressure immediately before and during the fire ranged from about 50 to 90 pounds and there is evidence of witnesses, some of whom were introduced by appellee, that even less than 50 pounds pressure would be sufficient to comply with the requirements of the ordinance. While the ordinance does require the water company to install fire plugs at such places as may be designated by the city for the latter's use in case of fire, it does not impose upon it the duty to keep the fire plugs in working order and unobstructed from accumulations of mud and silt which accumulate during periods of nonuse. Generally speaking, a city fire department assumes the duty of periodically opening the fire plugs and flushing out such accumulations, but there is no evidence in this instance as to who assumed that duty or whether the plugs were kept in proper condition. The evidence indicates that there were one or more other fire plugs near enough the fire to be utilized but no hose were attached to them. In providing that the pressure would be sufficient to force water through 2-inch fire hose vertically 45 feet, it was, of course, contemplated that the hose would be equipped with a proper nozzle. The evidence is vague and indefinite as to whether the hose used was so equipped or that the pressure through the larger hose that was used would be the same as it would through the 2-inch hose.

It appears that there was a hitching rack in front of the Dingus building made of iron pipes which as we understand consisted of two upright pieces to which a horizontal pipe was attached with elbows. Shortly after the fire department had arrived and the water hose was being laid, this pipe, according to the evidence of some of the witnesses, exploded and knocked one man about 30 feet, killing him. There is no explanation as to why this pipe would explode, if in fact it did, and from the evidence as a whole one of two things is apparent, either that the explosion was on the inside of the building, which would indicate that the fire had reached the interior, or that the heat outside and some distance from the building was very intense, which would indicate that the fire had reached a stage far beyond that testified to by witnesses for appellee.

Appellee had the burden of establishing every fact necessary to a recovery, and it is apparent from the foregoing that in some particulars he failed to meet the burden. All other questions are reserved.

For the reasons indicated, the judgment is reversed and the cause remanded for proceedings consistent with this opinion.

Whole court sitting.